**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| BYTEMARK, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 2:16-cv-00543-JRG-RSP |
| | § | |
| MASABI LTD., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## I.      Introduction

Pursuant to Local Patent Rule 4-5(a) and in accordance with the Court's Amended Docket Control Order (Doc. #37) entered in this action, Plaintiff Bytemark, Inc. ("Plaintiff" or "Bytemark") submits herewith its Opening Claim Construction Brief with respect to U.S. patent Nos. 8,494,967 ("the '967 Patent") (Exhibit A) and 9,239,993 ("the '993 Patent") (Exhibit B) (collectively the "patents-in-suit").  The P.R. 4-3(b) Joint Claim Construction and Prehearing Statement (Doc. No. 51), filed on March 8, 2017, identifies the below disputed claim terms in the patents-in-suit.

## II.      The Patents-in-Suit

The '967 Patent was issued on July 23, 2013 on an application filed on May 18, 2012. Plaintiff has asserted at least claims 1- 23 and 34 of the '967 Patent against Defendant Masabi, Ltd. ("Defendant" or "Masabi").  The '993 Patent was issued on January 19, 2016 on an application that was filed on May 23, 2013.  Plaintiff has asserted at least claims 1- 17 and 22- 24 of the '993 Patent against Defendant.  The Patents-in-Suit disclose and claim Bytemark's V3 Ticketing Technology.

III.    **Claim Construction Legal Standards**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  The general rule is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Core Wireless Licensing S.a.r.l. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG-RSP, 2016 WL 4374961, at *1 (E.D. Tex. Aug. 16, 2016) ("[t]here is a strong presumption that claim terms carry their plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention.").

"The claim construction inquiry ... begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)).  A term's context in the asserted claim can be instructive.  *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim

terms are typically used consistently throughout the patent.  *Id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent.  *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one."); *Core Wireless Licensing S.a.r.l.,* 2016 WL 4374961, at *2.

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic

4

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*; *Optis Cellular Tech., LLC v. Kyocera Corp.*, 2017 WL 541298, at *2–4 (E.D. Tex. Feb. 9, 2017).

## IV.   Construction of Disputed Terms

### A.   Plaintiff's Proposed Constructions

The '967 and '993 Patents teach that while electronic ticketing systems exist for distributing information that can constitute a ticket, verification of tickets in such systems is difficult ('967 col. 1:24 – 28). This is in part because the time taken to verify an electronic ticket is far greater than that of even the old paper ticket system ('967 col. 1:32 – 35, 2:17 – 19), making electronic ticketing systems impractical for use in open venues given the large crowds that often attend them ('967 col. 2:21 – 22). The '967 Patent espouses using human ticket takers merely looking at a user's display to immediately verify that the user has a valid ticket ('967 col. 1:38 – 40, col. 2:63 – 65, col. 3:14 - 16, col. 3: 20 - 23). To support this, the user's display device provides a visual object in the form of an animation or other human-perceptible visual image for instantaneous visual recognition and verification by the ticket taker ('967 col. 2:24 – 33, col. 2:42 - 44, col. 3: 25 - 35), thereby providing the increased verification speed ('967 and '993 Abstract) required to practically use an electronic ticketing system in open venues attended by potentially large crowds ('967 col. 2:12 – 22). It is not practical for ticket takers to waste time attempting to ascertain whether an electronic ticket is valid using traditional methods ('967 col. 1:24 – 40, col. 2: 12 - 22). Thus, the instantaneous visual recognition and verification of human-perceptible images by a human ticket taker is a key aspect of the invention, without which the invention is lacking in practical utility.

With respect to the '967 Patent, the intrinsic record indicates that "visual validation display object" means data, computer code, or command that facilitates the display on the customer's device of an animation or other human-perceptible visual image sufficient to enable a ticket taker to instantaneously visually recognize and verify the ticket.

The '967 Patent teaches that a visual validation display object may be a) data ('967 col. 2: 42 – 44, col. 4:12 – 16), b) computer code ('967 col. 2:33 – 36, col. 2: 53 – 63, col. 4: 5 – 6), or c) a command ('967 col. 2:36 – 42). The '967 Patent further teaches that the visual validation display object facilitates the display on the customer's device of the animation or other human-perceptible visual image ('967 col. 1:38 – 40, col. 2:63 – 65, col. 3:14 - 16, col. 3:20 – 23). Such display is sufficient to enable a ticket taker to instantaneously visually recognize and verify the ticket ('967 col. 1: 59 – 60, FIG. 11, col. 2:63 – 65). *See also* claims 1- 23 and 34 of the '967 Patent; '967 Abstract; '967 col. 1:15 – 43; '967 col. 2:4 – 65; '967 col. 3:12 – 40; '967 col. 3:55 – 60; '967 col. 4: 5 – 6; '967 col. 4: 12 – 16; '967 col. 9: 19 – 49; '967 col. 10: 5 – 10; '967 FIG. 10; '967 FIG. 11; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C).

The intrinsic record indicates that "the visual validation display object configured to be readily recognizable visually by the ticket taker" means the animation or other human-perceptible visual image sufficient to be instantaneously visually recognized and verified by the ticket taker. As previously discussed, the display is sufficient to enable a ticket taker to instantaneously visually recognize and verify the ticket ('967 col. 1: 59 – 60, FIG. 11, col. 2:63 – 65, col. 3: 14 - 16). *See also* claims 1- 23 and 34 of the '967 Patent; 967 Abstract; '967 col. 1:15 – 43; '967 col. 2:10 – 11; '967 col. 2:12 – 26; '967 col. 2:23 – 44; '967 col. 2:45 – 65; '967 col. 3:12 – 35; '967 col. 3:55 – 60; '967 col. 4:15 – 16; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C).

The intrinsic record indicates that "that causes upon visual recognition by the ticket taker" means when the animation or other human-perceptible visual image is instantaneously visually recognized and verified by the ticket taker.  As previously discussed, the displayed animation or other human-perceptible visual image is instantaneously visually recognized by the ticket taker who verifies the ticket ('967 col. 1: 59 – 60, FIG. 11, col. 2:63 – 65, col. 3: 14 - 16).  *See also* claims 1-23, and 34 of the '967 Patent; '967 Abstract; '967 col. 1:15 – 43; '967 col. 2:4 – 65; '967 col. 3:12 – 40; '967 col. 3:55 – 60; '967 col. 4: 5 – 6; '967 col. 4: 12 – 16; '967 col. 9: 19 – 49; '967 col. 10: 5 – 10; '967 FIG. 10; '967 FIG.11; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C).

In the case of the '993 Patent, the intrinsic record indicates that "validation display object" means data, computer code, or command that facilitates the display on the customer's device of an animation or other human-perceptible visual image sufficient to enable a ticket taker to instantaneously visually recognize and verify the ticket.  *See* claims 1-17 and 22-24 of the '993 Patent; claims 1-23, and 34 of the '967 Patent; '967 Abstract; '993 Abstract; '993 col. 1:18 – 46; '993 col. 2:8 – 3:2; '993 col. 3:16 – 44; '993 col. 3:59 – 64; '993 col. 4: 9 – 10; '993 col. 4: 16 – 21; '993 col. 9: 26 – 56; '993 col. 10: 12 – 17; '993 FIG. 10; '993 FIG. 11; prosecution history of the '993 Patent; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C).

The intrinsic evidence indicates that "for visual recognition by the ticket taker" means the animation or other human-perceptible visual image is for instantaneous visual recognition and verification by the ticket taker. The asserted patents espouse using human ticket takers merely looking at a user's display to immediately verify that the user has a valid ticket ('967 col. 1:38 – 40, col. 2:63 – 65, col. 3: 14 - 16, col. 3: 20 – 23). To support this, the user's display device

provides a larger visual object in the form of an animation or other human-perceptible visual image for instantaneous visual recognition and verification by the ticket taker ('967 col. 2: 24 – 33, col. 2: 42 - 44, col. 3: 25 - 35), thereby providing the increased verification speed required to practically use electronic ticketing in open venues attended by potentially large crowds ('967 col. 2:12 – 22). *See* 1-17 and 22-24 of the '993 Patent; claims 1-23, and 34 of the '967 Patent; '967 Abstract; '993 Abstract, '993 col, 1:18 – 46; '993 col. 2:8 – 3:2; '993 col. 3:16 – 44; '993 col. 3:59 – 64; '993 col. 4: 9 – 10; '993 col. 4: 16 – 21; '993 col. 9: 26 – 56; '993 col. 10: 12 – 17; '993 FIG. 10; '993 FIG. 11; prosecution history of the '993 Patent; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C).

### B.  Defendant's Proposed Constructions

Defendant presents a litany of terms and phrases of the Patents-in-Suit's claims it proposes constructions for.  *See* Joint Claim Construction and Prehearing Statement, Exhibit D (Doc. No. 51).  Defendant provides no support or reasoning other than broad references to the intrinsic record and extrinsic evidence as to why the terms and phrases should not be given their ordinary and customary meaning.  To the extent Masabi cites to the prosecution history of the Patent-in-Suit, and in one instance cites only to the prosecution history, Masabi provides neither evidence nor explanation as to how the prosecution history supports its construction and meets the high burden articulated by the Federal Circuit.  *See Avid Tech.*, 812 F.3d at 1045.  To the extent Masabi's proposed constructions reference the specifications, Masabi's references do not support its proposed constructions, are inconsistent with the disclosures in the specifications, and import limitations into the claim language or construction of the terms or phrases.[1]  Defendant's attempt

---

[1] In support of Defendant's proposed constructions, Masabi references "PO."  The first time this reference appears is in the parties' P.R. 4-3(b) Joint Claim Construction and Prehearing Statement (Doc. No. 51).  Defendant does not define "PO" and it is unclear what this reference is.

to deviate from the ordinary and customary meaning of these terms and phrases in such a manner falls well short of the presumption laid out by the Federal Circuit.  *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

Finally, Defendant's reliance on extrinsic evidence to support its proposed constructions is misplaced in the absence of an ambiguity.  *See Vitronics,* 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."); *Profectus Tech. LLC v. Huawei Techs. Co.,* No. 6:11-CV-474, 2014 WL 1575719, at *9 (E.D. Tex. Apr. 17, 2014), *aff'd*, 823 F.3d 1375 (Fed. Cir. 2016).  Here, one with ordinary skill in the art would understand the ordinary and customary meaning of these terms and phrases when read in the context of the claims, specification, and prosecution history of the Patents-in-Suit and therefore Defendant's extrinsic evidence should be rejected.

**V.**     **Conclusion**

For all of the reasons given above, the Court is respectfully requested to construe the disputed claim terms as discussed herein, as requested by Plaintiff.

Dated: April 19, 2017                    Respectfully submitted,

Darius Keyhani
Meredith & Keyhani, PLLC
125 Park Avenue, 25th Floor
New York, New York 10017
Tel. (212) 760-0098
Fax (212) 202-3819
dkeyhani@meredithkeyhani.com

ANDY TINDEL
Texas State Bar No. 20054500
MT² LAW GROUP
MANN | TINDEL | THOMPSON
112 East Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 596-0900
Facsimile:  (903) 596-0909
Email: atindel@andytindel.com

*Attorneys for Plaintiff Bytemark, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that all known counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per E. Dist. Tex. Loc. Ct. R. CV-5(a)(3) on this the 19th day of April, 2017.  Any other known counsel of record will be served with a copy of this document by email and/or facsimile transmission

Andy Tindel