# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

BYTEMARK, INC.,                     §
                                    §
            Plaintiff,              §
                                    §
v.                                  §          Case No. 2:16-cv-0543-JRG-RSP
                                    §
MASABI, LTD.,                       §
                                    §
            Defendant.              §
                                    §

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On May 31, 2017, the Court held an oral hearing to determine the proper construction of

the disputed claim terms in U.S. Patent Nos. 8,494,967 (the "'967 Patent") and 9,239,993 (the

"'993 Patent). The Court has considered the parties' claim construction briefing (Dkt. Nos. 54, 59,

and 60) and arguments. Based on the intrinsic and extrinsic evidence, the Court construes the

disputed terms in this Memorandum Opinion and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303

(Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015).

## BACKGROUND

Plaintiff Bytemark, Inc. ("Bytemark") asserts the '967 Patent and '993 Patent against

Defendant Masabi, Ltd. ("Masabi"). The '993 Patent is in the same patent family as the '967 Patent

through a continuation-in-part application.

The '967 Patent and '993 Patent relate to a method for verifying electronically purchased

tickets that may be displayed on a user's computing device, for example a mobile phone. The

Abstract of the '967 Patent recites:

> This invention discloses a novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event. This removes the need to use a bar-code scanner on an LCD display of a cell phone or other device and speeds up the rate at which human ticket takers can verify ticket holders. The system providing the service also can maintain a persistent communication channel with the user device in order to control the ticket verification process.

'967 Patent Abstract. The Abstract of the '993 Patent recites:

> This invention discloses a novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event. This removes the need to use a bar-code scanner on an LCD display of a cell phone or other device and speeds up the rate at which human ticket takers can verify ticket holders. The system also can permit ticket purchase verification in the absence of a network connection during verification.

'993 Patent Abstract. Most of the two specifications are identical.[1] The patents describe that traditional electronic ticketing solutions utilize a bar code or QR code on the recipient's telephone display screen. A scanner is used to scan the bar code or QR code to verify the ticket. *Id* at 1:28-32. 2:12-16. Such techniques are described as being unsatisfactory due to errors in the scanning process and the time required for the scanning process. *Id*. at 1:32-37, 2:14-21. The patents describe providing a visual display object on the user's display screen that a human ticket taker can visually perceive to provide a quick verification of the ticket. *Id*. at 1:40-43, 2:23-30. Examples of the visual display object include patterns of color change, animations and geometric patterns. *Id*. at 2:32-33.

---

[1] Unless otherwise noted, citations provided herein are made to the '967 Patent.

## LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry. . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). A term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim

terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary fact finding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## AGREED TERMS

The parties agreed to the following terms:

| Term | Agreed Construction |
|---|---|
| "obtain" | Plain and ordinary meaning |
| "readily recognizable visually"[3] | Plain and ordinary meaning |
| "unique alphanumeric string" | Plain and ordinary meaning |
| "that causes upon visual recognition by the ticket taker" | When the animation or other human-perceptible visual image is instantaneously visually recognized and verified by the ticket taker |
| "for visual recognition by the ticket taker" | The animation or other human-perceptible visual image is for instantaneous visual recognition and verification by the ticket taker |

(Dkt. No. 63-1 at 2.)

## DISPUTED TERMS

### 1. Validation Terms

**"visual validation display object" ('967 Patent, all asserted claims[4])**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| Data, computer code, or command that facilitates the display on the customer's device of an animation or other human-perceptible visual image sufficient to enable a | "any object visually present on a user's device that may be utilized for validation purposes" |

---

[3] Bytemark listed this term in both the "Agreed Constructions" and the "Disputed Terms" sections of the parties' final Patent Rule 4-5(d) Joint Claim Construction Chart. (Dkt. No. 63-1 at 2-3.) At the oral hearing, the Court presented preliminary constructions listing this term as "Agreed" under preliminary construction term #2. Bytemark expressed agreement with the Court's preliminary construction. (Dkt. No. 80 at 44-45, 48.)

[4]The asserted claims are at least claims 1-6, 17-23 and 34 of the '967 Patent and claims 16-17 and 22-24 of the '993 Patent.  (Dkt. No. 51 at 1.)

| ticket taker to instantaneously visually recognize and verify the ticket | or<br><br>"a validating visual object is one that is readily recognizable from human observation" |

**"validation display object" ('993 Patent, all asserted claims)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
| --- | --- |
| Data, computer code, or command that facilitates the display on the customer's device of an animation or other human-perceptible visual image sufficient to enable a ticket taker to instantaneously visually recognize and verify the ticket | "any object present on a user's device that may be utilized for validation purposes" |

The parties dispute whether the "object" is (1) what is actually displayed or (2) the information (code, command, etc.) that generates what is displayed. Further, the parties dispute whether both terms are limited to humanly visually recognizable objects.

## Positions of the Parties

Bytemark contends that the patents teach that the object can be data, code or a command: data ('967 2:42-44); computer code ('967 2:33-36, 2:53-63, 4:5-6); or command ('967 2:36-42). (Dkt. No. 54 at 6.) Bytemark contends that the visual validation display object facilitates the display on the customer's device of the animation or human-perceptible visual image. (*Id.*) Bytemark contends that the object must create an image or other animation that is visually recognizable to a human for human verification. (*Id.* (citing '967 Patent 1:59-60, FIG. 11, 2:63-65, 3:14-16, Abstract, 1:15-43; 2:10-11, 2:12-26, 2:23-44, 2:45-65, 3:12-35, 3:55-60, 4:15-16; prosecution history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C)).)

For the '993 Patent and the term "validation display object," Bytemark points to the following citations: '993 Abstract; '993 Patent 1:18-46; 2:8-3:2, 3:16-44, 3:59-64, col. 4:9-10,

8

4:16-21, 9:26-56, 10:12-17, Figures 10-11; prosecution history of the '993 Patent; prosecution

history of the '967 Patent; Bytemark Production 155- 158 (Exhibit C). (Dkt. No. 54 at 7.)

Bytemark objects to Masabi's construction as being so broad that it would encompass prior

art that was explicitly excluded by the specification. (Dkt. No. 60 at 5 (citing '967 Patent 2:12-22,

3:20-23).)

Masabi contends that Bytemark is improperly incorporating limitations from the

specification. (Dkt. No. 59 at 10.) Masabi identifies dictionary definitions of the individual words

of the term to support its positions. (*Id.*) As to "validation display object" used in the '993 Patent

claims, Masabi presents the same arguments. Further, Masabi notes that the '993 Patent term

removes the word "visual," which is found in the '967 Patent term. Masabi objects to Bytemark

adding the "visual" concept into the '993 Patent term. (*Id*. at 20.)

At the oral hearing, Bytemark agreed to the Court's construction adopted below. (Dkt. No.

80 at 44-45, 48.) When presented with the Court's proposal, Masabi provided no argument.

**<u>Analysis</u>**

Generally, the specification citations describe the disputed terms in context of what is being

displayed on the screen. '967 Patent 1:38-40, 2:63-65, 3:14-16, 3:20-23, 4:12-16, 4:22-44.

However, in several passages the "object" is described as the data, computer code, or commands

that generate what is displayed on the screen. *Id*. at 2:33-36, 2:36-42. Bytemark's construction

would limit the terms to just the information that generates what is actually displayed, while

Masabi would interpret the terms as merely being what is displayed on the screen. However, in the

specification, the terms are utilized to describe both concepts. Usage in the claims is equally broad.

For example, claim 1 references "the visual validation display object configured to be readily

recognizable visually by the ticket taker," a usage more conforming to the object being what is

displayed on the screen. However, elsewhere the same claim references "transmitting to the user's computer device a data file comprising the visual validation display object," a usage that conforms more to the code or commands that generate what is displayed on the screen. Similarly, claims 1 and 8 of the '993 Patent reference the "object" in context of being displayed "for visual recognition by the ticket taker." In context of the specification and the claims, the terms more broadly encompass what is displayed or the code or commands that generate what is displayed.

The parties also present a dispute as to whether the two disputed terms have a common meaning. Masabi presents two possible constructions as to "visual validation display object." The first construction could encompass barcodes and QR codes. Masabi's second construction limits the term to those readily recognizable by human observation. As to "validation display object," Masabi seeks the first construction, arguing that this term lacks usage of "visual." The specification, however, is explicitly clear that validation display objects present depictions that are readily perceptible to a human and do not include bar codes, QR codes, and the like. In particular, the specification states:

> Validating Visual Object Displays:
> There [*sic*] many kinds of validation displays that can be utilized. The criterion for what constitutes a validating visual object is one that is readily recognizable from human observation, is encapsulated in such a way as to be transmitted to the customer's device with a minimum of network latency or download time, and that can be reasonably secured so as to avoid piracy.
> Barcodes and similar codes like the QR code are not validating visual objects because a person looking at them cannot tell one apart from another. Instead, the person has to rely on a barcode scanner and computing device to verify the barcode.

'967 Patent 3:12-23. Moreover, the specification states:

> In this invention, the ticket is procured electronically and stored on the user's device. However, when the ticket is to be taken the verification is determined by a larger visual object that a human can perceive without a machine scanning it.

*Id*. at 2:23-25. The specification also includes:

> This invention discloses a novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event. This removes the need to use a bar-code scanner on an LCD display of a cell phone or other device and speeds up the rate at which human ticket takers can verify ticket holders.

*Id*. at Abstract. Further,

> Therefore, there is a need for an electronic ticketing system that provides a human-perceivable visual display that the venue can rely on to verify the ticket. This invention provides for the distribution of an electronic ticket that also contains a visual display that ticket takers can rely on as verification, without using a scanning device.

*Id*. at 1:38-43. In context of the specification, it is clear that the validation objects relate to recognizable objects under human perception. Though the term of the '993 Patent does not use "visual," it is clear from the surrounding claim language that the "objects" in the claims are visually perceivable by the human eye: "the secured validation display object upon validation of the token for visual recognition by the ticket taker." '993 Patent claims 1 and 8. In context of the specification usage and the surrounding claim language, it is clear that the two terms include the human recognition concept.

**The Court construes the terms "visual validation display object" and "validation display object" to mean "any object that is readily recognizable from human observation that can verify a ticket, or the code or commands that can generate such an object."**

11

2.  **"possession"  ('967 Patent, claims 1, 17, and 18)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
| --- | --- |
| No construction necessary - plain and ordinary meaning | "local physical presence on a local device" <br><br> or <br><br> "stored on a user's computer device" |

In the briefing, the parties dispute whether the term references legal title and ownership verses actual presence, control or storage of a ticket.

**Positions of the Parties**

Masabi points to the usage in the claims, quoting for example claim 1: "obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device." Masabi contends that the ordinary meaning of the term may carry multiple definitions. For example, Masabi points to "[v]isible power or control over something, as distinct from lawful ownership; holding or occupancy as distinct from ownership." (Dkt. No. 59 at 8 (citing Dkt. No. 59-4 (Oxford Dictionary Online)).) Masabi states that the same dictionary definition also indicates the term "possession" may more broadly cover the mere state of "ownership." (*Id*.). Masabi contends that the claims use the term in context of "possession of a purchased electronic ticket on a user's computer device," which conforms to Masabi's proposed construction. Masabi contends construction is needed as Masabi does not know what ordinary meaning Bytemark is asserting. (*Id*.)

Bytemark contends that the term is not used in the specification and that the ordinary meaning of the term is "right to use." Bytemark contends that in context of the claims, a user has a ticket that was purchased, and therefore has the right to use it. (Dkt. No. 60 at 3-4.) Bytemark

states that it would agree to "ownership." (*Id*. at 4.) Bytemark contends there is no basis to add

"local physical presence on a local device" or "stored on a user's computer device."

At the oral hearing, Bytemark emphasized the concept of "the right to use." (Dkt. No. 80

at 7-8.) Specifically, Bytemark stated that possession in the patents was not related to physical

possession. (*Id*. at 8.) Bytemark stated that, within the patents, control of the ticket was controlled

at the server level, not by a user. (*Id*. at 9.) More specifically, Bytemark contended that all of the

method steps of the claims were "performed by the server." (*See id*. at 9-12.) Bytemark contended

that, thus, possession did not relate to what was on a user's device because control of the ticket

could remain at the server. (*Id*. at 9.) Bytemark contended that within the specification, the ticket

remained at the server and, thus, the claims are inoperable if one contends that the whole ticket

has to be on the phone. (*Id*. at 10-11.) Bytemark contended that in the specification the only data

provided to a user's device is the token and the whole ticketing information includes information

on the server. (*Id*. at 13-14.) Bytemark contended that this conforms to the embodiments in the

specification which describe that a ticket can be transferred, resold, or terminated. Bytemark

asserted that such activities are all performed by holding a ticket on a server. (*Id*. at 10, 16-17.)

**Analysis**

"Possession" in an ordinary meaning may take on differing meanings. For example, in one

manner "possession" may be related to legal title, and in another manner may be related to holding

or controlling something. All claims use the term in context of "possession of a purchased

electronic ticket on a user's computer device." The broader context of the phrase is: "A method by

a server system for obtaining visual validation of the possession of a purchased electronic ticket

on a user's computer device for presentation to a ticket taker" ('967 Patent claim 1); "a method for

obtaining visual validation of the possession of a purchased electronic ticket on a user's computer

device for presentation to a ticket taker" ('967 Patent claim 17); "obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker" ('967 Patent claim 18). In all cases, the term is used in relation to a verification process in which some information actually resides on the user's computer device. Such usage conforms to the extensive citations in the specification whereby an electronic ticket is confirmed to reside on a user's computer device. '967 Patent 2:23-26, 2:45-65, 3:61-7:6, 4:32-42, 4:43-62, 7:42-56, 8:1-29, Figure 1, Figure 2, Figure 8, Figure 9, Figure 13a, Figure 13b. The patents do not address whether a user has legal title or ownership of a ticket, but rather merely whether the ticket on the computing device is a valid ticket.  Bytemark has pointed to no teaching in the specification that mere legal title or ownership, without actually having data related to the electronic ticket on the computing device, is sufficient to be "possession of a purchased electronic ticket *on* a user's computer device." '967 Patent claims 1, 17, and 18 (emphasis added).  Claims are to be interpreted in the context of the intrinsic evidence: the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314. Thus, "claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1314-15 (citation omitted). Further, a term's context in the asserted claim can be instructive. *Id.* at 1314. Here, the claims explicitly make clear that what is "on" the user's device is what is claimed, not mere ownership or legal title. Further, such a reading conforms to the context of the description in the specification as cited above.

In support of Bytemark's argument, Bytemark in effect argues for a narrow meaning of what comprises an electronic ticket, i.e., an "electronic ticket" must include *all* information related to the ticket purchase transaction. In essence, Bytemark argues that if all the information surrounding a transaction is not placed on a user's device or if a server is needed to help control the ticket, then the user does not physically "possess" the electronic ticket. However, such a view

14

does not conform to the specification. The specification describes, in one example, that a ticket is provided to a user's device merely by providing a token or other ticket information. '967 Patent at 2:45-65, 3:60-4:6, 4:43-5:5, 7:20-41, 8:1-29, Figure 2. Elsewhere, tickets are described and shown as residing on a user's device even though other information (such as, for example, a copy of the token stored on a server) must still be accessed from a server to activate the ticket. *Id*. at 4:7-31, Figures 9-11. Thus, the patent describes that when a ticket is first purchased (even before subsequent verification, activation, and transmission of the visual object) what is stored on the user's device is equated to the ticket stored on the user's computer: "In this invention, the ticket is procured electronically and ***stored*** on the user's device." '967 Patent 2:23-24, Figure 8 ("Ticket is ***Stored*** on Buyer's Device Until Use") (emphasis added); *See id.* at 2:24-44, 2:45-65, 3:60-4:6.

Finally, Bytemark's arguments that tickets can be transferred, resold or terminated do not change the meaning of the claim language of "possession" of a ticket "on a user's computer device." The specification does describe transferring, reselling, etc. However, in such embodiments, ticket information still originally resides on the original ticket holder's computing device. *Id*. at 4:43-5:5, 8:1-29. Though the user may send a request to the server to aid in moving the ticket from one device to another device, ticket information is still described as residing at the original device prior to valid ticket information being provided to the subsequent device. *See id*.

The Court also finds that construction of the full phrase "possession of a purchased electronic ticket on a user's computer device" would be most understandable.

**The Court construes "possession of a purchased electronic ticket on a user's computer device" to mean "a purchased electronic ticket is stored on a user's computer device."**

3. **"user possesses"  ('967 Patent, claims 1, 17, and 18)**

15

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "user has a physical presence on a local device" <br><br> or <br><br> "stored on a user's computer device" |

**Positions of the Parties**

The parties present the same arguments as presented above with regard to "possession." (Dkt. No. 59 at 9-10; Dkt. No. 60 at 4.)

**Analysis**

The term in question is used in the claims in the phrases: "to obtain a visual validation display object that confirms that the user possesses the previously purchased [and valid] electronic ticket." '967 Patent claims 1, 17 and 18. As discussed above, in context of the specification, possession is used in context of holding or having physical control of the ticket, not that the ticketholder has legal ownership to the ticket. Further, as also discussed above, the surrounding claim language of each claim makes clear that the user's possession is with regard to possession on the user's computer device.

**The Court construes the term "user possesses" to mean "stored on the user's computer device."**

4. **"previously purchased electronic ticket"** (**'967 Patent, claims 1, 17, and 18; '993 Patent, claims 1, 2, 4, and 23**)

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "a ticket purchased in a discreet time period and discreet operation separate and prior to the request for validation" |

16

The parties dispute whether the term requires the purchasing operation and the validation operation to be separate.

**Positions of the Parties**

Masabi contends that the system of the '967 Patent specifically recites a method "by a server system" for "obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device," the server system "receiving from the user's computer device a request" "to obtain a visual validation display object that confirms that the user possesses the previously purchased electronic ticket." '967 Patent, claim 1.

Masabi also points to the surrounding language of the '993 Patent claims: a computer system that transmits "a token associated with a previously purchased electronic ticket to a remote display device" and stores a copy "on a central computer system" and then validates the token by "by matching the token transmitted to the remote display device to the copy of the unique alphanumeric string stored on the central computing system to provide a ticket payload to the remote display device." '993 Patent claims 1 and 8. Masabi contends that the claim language of the '993 patent recites a central computer system that sends a token to the mobile device and stores a copy in one transaction and validates the token by comparing the mobile phone token to the copy stored on the central computer system (Ex. B, Claims 1 and 8). Masabi contends that it is illogical and contradictory for the claim language of the '993 patent to be construed as encompassing purchase and delivery of the validation display element in a single transaction. (Dkt. No. 59 at 21.) Masabi contends that there is no purpose for a central computer system to match tokens it had just sent and stored a copy of, if purchase and validation is performed in a single operation. (*Id.*) Masabi contends that Bytemark is attempting to construe the claim language of the '993 patent to read on a single purchase/delivery of an electronic ticket. (*Id.* at 21-22.)

17

Masabi contends that the definition of "previously" is "at a previous or earlier time." (Dkt. No. 59 at 11 (citing Dkt. No. 59-8 (Oxford Dictionary Online)).) Masabi contends that the claim language explicitly refers to a "possession of a purchased electronic ticket on a user's computer device" and "that the user possesses the previously purchased electronic ticket."  Masabi contends that for a server to validate a purchased ticket "on a user's device," it is a logical imperative that the pre-purchased electronic ticket is *on* the user's device prior to the user's device requesting the visual validation display object from the server. (*Id.* (emphasis added).)

Bytemark contends that Masabi provides no intrinsic evidence for Masabi's position. Bytemark accepts the dictionary definition of "at a previous or earlier time." (Dkt. No. 60 at 5.)

## **Analysis**

The real dispute between the parties relates to whether a ticket has to be bought and then at a later time the system server receives a request for a visual validation display object.  This dispute is not really a dispute as to this particular term, but rather a dispute relating to the meaning and interrelationship of the surrounding claim language. For example, the term is found in the '967 Patent claim in the clause:

> "receiving [receive] from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased [and valid] electronic ticket"

'967 Patent claims 1, 17, and 18. This clause is presented for construction below as a separate term. Similarly, it is the relationship of this full clause to other elements of the '993 Patent claims that raises the dispute in question. Those disputes are more properly resolved within the full clause and entirety of the surrounding claim language. As to the meaning of "previously purchased electronic ticket" itself, the parties do not appear to dispute that it is a ticket that is purchased at a

18

"previous or earlier time." At the oral hearing, Bytemark agreed to the Court's construction adopted herein. (Dkt. No. 80 at 25, 44-45, 48.) Similarly, Masabi agreed to such construction to the extent that the Court maintained the "discrete" operation concept in the constructions of the surrounding claim language as provided in the Court's preliminary constructions for other terms. (*Id.* at 47.)[5]

**The Court construes the term "previously purchased electronic ticket" to mean "a ticket that is purchased at a previous or earlier time."**

5. **"receiving [receive] from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased [and valid] electronic ticket" ('967 Patent, claims 1, 17, and 18)[6]**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| Plain and ordinary meaning except as to the phrase "visual validation display object" as construed by Bytemark | "Server receiving request from mobile device to confirm a prior purchase of ticket from a discreet prior operation and in response to confirmation sending a visual validation display object to users device" |

In the briefing, Bytemark objected to Masabi's reference to the server. At the oral hearing, Bytemark focused on Masabi's reference to the receiving operation being a discrete operation separate from the purchase operation.

<u>Positions of the Parties</u>

Masabi contends that it is clear within the context of the claim language that the "server system" / "computer" receives the request from the mobile device to verify a previous purchase of

---

[5] The Court's constructions below maintain the language in question in the other constructions.
[6] The parties' joint claim chart did not identify claim 18. The language in question is also found within claim 18.

a ticket and to obtain a "visual validation display object" that confirms the user is in possession of the previously purchased ticket. (Dkt. No. 59 at 14.) Masabi contends that Bytemark intends to expand the claim scope to encompass a single transaction purchase of a ticket including a visual validation display object. Masabi contends that its construction is consistent with the plain meaning and context of the phrase. (*Id*. at 14-15.)

Bytemark contends that Masabi points to no intrinsic evidence. Bytemark objects to Masabi's inclusion of "server," similar to Bytemark's argument on the "request to verify" term below. Bytemark contends that with the exception of the language "visual validation display object" (construed above), no further construction is needed. (Dkt. No. 60 at 6-7.)

At the oral hearing, Bytemark argued that the "receiving…" limitation need not be a "discrete" step from the purchase step. Specifically, Bytemark argued that all of the claim steps could be performed on the user's device (i.e., a phone) itself. (Dkt. No. 80 at 26-29.)[7] Bytemark suggested that in one operation, the user device could purchase the ticket and then the user device (together in the same operation) could receive from itself a request to verify the purchase. (*Id*. at 27-28.) Bytemark contended that such a process would be useful for situations in which the user device was offline with no access to the Internet. (*Id*. at 30-31.) Bytemark contended that the specification described such an embodiment where the initial ticket purchase provided the entire ticket payload including the visual validation object. Specifically, Bytemark pointed to the passage

---

[7] Such argument was in direct contradiction to Bytemark's arguments presented at the oral hearing for the "possession" term. For that term Bytemark stated that all of the steps were performed by the server, thus mandating that "possession…on a user's computer device" did not require possession "on" the device. When pressed regarding this direct contradiction, Bytemark argued that the patent teaches two embodiments, one in which the claim steps relate to communication with a server and another in which the claim steps relate to a user device communicating with itself. (Dkt. No. 80 at 27-29.)

at '967 Patent 4:32-42. (*Id*. at 26-27, 40-41.) Bytemark contended that requiring separate operations would contradict the embodiment at '967 Patent 4:32-42.

**Analysis**

The claim language itself describes "receiving … a request to verify purchase of ***a previously purchased electronic ticket***" (emphasis added). In context of the claim language, it is clear that the receiving operation is distinct and follows the "previous" purchase operation. The specification also conforms to such an interpretation. '967 Patent 2:23-65, 3:60-4:31, Figures 2-3, 9-11, 13a.

Bytemark has argued that the specification at '967 Patent 4:32-42 teaches an embodiment in which the ticket payload is downloaded with the purchase of the ticket, and the customer has the visual validation object at the time of purchase. Though Bytemark may interpret the 4:32-42 embodiment correctly, Bytemark does not address that the claims at issue are clearly not directed to that embodiment.

The claims are directed to a method by "a server system for obtaining visual validation" (claim 1), program code on "a computer system [that] causes the computer system to perform" the method steps (claim 17), and a system "comprising one or more computers" configured to perform the claimed operations (claim 18). Further, claim 1 for example, then states "receiving from the user's computer device a request to verify" the "previously purchased electronic ticket," "receiving from the user's computer device a token," and "determining whether a token associated with the purchased electronic ticket" has been stored and whether the received token is valid. These various steps are steps performed by the server. When pressed to identify where in the specification these receiving steps could be interpreted as being steps that the user device receives from itself, Bytemark could only point to the passage at 4:32-42 in which the entire ticket payload (including

21

the validation display object) is provided at purchase. However, Bytemark could not identify where in this passage any of the numerous limitations of the claim are performed. (*See* Dkt. No. 80 at 27-41.)

The Court finds that the embodiment at 4:32-42 is clearly not applicable to what is claimed in the asserted claims. Thus, for example with regard to claim 1, the 4:32-42 embodiment in question does not include "receiving from a user's computer device a request to verify." The embodiment does not describe a "previously purchased" ticket. The embodiment is not applicable to "receiving a token associated with the received request." The embodiment does not include the step of determining whether a token has been stored and whether a token that is "received" is valid. The embodiment provides no teaching as to (1) activation being dependent upon a determination regarding the token's validity, and (2) causing an activation based on such determination. In fact, almost the entirety of the claimed steps are absent from the 4:32-42 embodiment in which the entire ticket payload is merely downloaded to the customer's device upon purchase. *See* '967 Patent at 4:32-42. The same holds true for claims 17 and 18. The embodiment at '967 Patent 4:32-42 is described as a "security tradeoff" to the claimed embodiments. *See id.* In context of the claims and the specification as a whole, the security missing in that embodiment is the use of subsequent "receiving" steps and the associated token validation and object transmission steps explicitly recited in the claims.

In context of the surrounding claim language itself and the specification, it is clear that receiving a request to verify the purchase of a "previously purchased electronic ticket" is a separate discrete step that is not merely the step of purchasing the ticket itself. As to the primary dispute presented, the Court concurs with Masabi's position.

As to the "mobile device" language, Masabi has pointed to no evidence supporting such change, and the specification explicitly contradicts such limitation. '967 Patent 2:6-11 ("a customer's device can be a personal computer, mobile phone, … or any other kind of computing device a user can use").

**The Court construes the term "receiving [receive] from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased [and valid] electronic ticket" to mean "receiving by [the server / computer system / one or more computers] a request from the user's computer device, the request being a request to (1) confirm a prior purchase of an electronic ticket from a discrete prior purchase operation and (2) obtain a visual validation display object that confirms that the user possesses the previously purchased [and valid] electronic ticket."**

6. **"request to verify purchase"  ('967 Patent, claims 1, 17, and 18)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "request sent from a user device to a server seeking verification of a ticket purchased in a discreet time period and discreet operation separate and prior to the request for validation" |

The parties' dispute raises similar issues as raised in the prior disputes regarding the "previous" concept and as to what receives the request (i.e., the "server" dispute).

**Positions of the Parties**

Masabi contends that the asserted independent claims of the '967 Patent recite a server system / computer system / one or more computers that receive from the user's computer device a

23

"request to verify purchase" of a "previously purchased electronic ticket." '967 Patent claims 1, 17, and 18. Masabi contends that each also recites the server system / computer system / computer determining whether the "token associated with the purchased ticket" "has been stored in a data record" on the server system / computer system / computer in order to determine validity. Masabi contends it is clear that the phrase "has been stored" indicates a transaction prior to the request to verify and determine validity. Masabi contends that its construction is the only logical and reasonable interpretation of a "request to verify purchase" as it properly defines the "request to verify purchase" as a request that is a separate and discrete process from the initial ticket purchase. (Dkt. No. 59 at 12-13.)

Bytemark contends that Masabi's construction inserts a limitation that verification must occur between a server and a user device. (Dkt. No. 60 at 6.) Bytemark contends that nothing in the claims or specification supports this construction. Bytemark asserts that Masabi's construction frustrates an embodiment in the patent that contemplates a customer not having internet access right before a payload's use, an embodiment in which the purchase of the ticket causes a ticket payload that includes the validating visual object to be downloaded to the customer's device at the time of purchase. (*Id*. (citing '967 4:32-42).)

At the oral hearing, neither party provided argument specific to this term.

**Analysis**

The claims in question are directed to a system that is used to verify tickets. The term in question is contained in a similar phrase in each asserted independent claim: "receiving [receive] from the user's computer device a request to verify purchase of a previously purchased electronic ticket." It is clear from this full phrase that what is claimed is a request to verify something that was previously purchased. Though Bytemark cites to an embodiment in which the ticket payload

24

is downloaded at the time of purchase, as discussed above such embodiment does not describe "receiving from the user's computer device a request to verify purchase of a previously purchased electronic ticket." Rather, the payload is provided at the time of purchase. Furthermore, that embodiment anticipates that a user may not be able to make the claimed request due to an absence of Internet availability. *See* '967 Patent at 4:32-42. In contrast, the surrounding claim language makes clear that a request is made with regard to verifying a previously purchased ticket. That dispute is addressed above in the full "receiving [receive] from the user's computer device…" term. Similarly, the dispute as to whether it is the "server" that is "receiving" the "request to verify" is also addressed above in the complete "receiving" term which includes the "request" term. After the construction of the surrounding individual claim terms, and construction of the full claim term in which the "request to verify purchase" is found, no further construction of "request to verify purchase" is required.

> **The Court construes the term "request to verify purchase" to have its plain and ordinary meaning.**

### 7. Activation Terms
**"activation"  ('967 Patent, claims 1, 17, and 18)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "server directed control of visual validation display object on the user's device" |

**"causing [cause] an activation"  ('967 Patent, claims 1, 17, and 18)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "Transmitting a file to the user's device containing a visual validation display object that is immediately displayed without user interaction" |

The parties dispute whether the activation has to be under server directed control and whether details of how activation is caused should be required.

**Positions of the Parties**

As to "activation," Masabi contends that independent claims 1, 17 and 18 each recite a server system / computer system / computer "causing an activation by transmitting to the user's computer device a data file the visual validation display object" or "cause an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object." '967 Patent claims 1, 17 and 18. Masabi also contends that the dictionary definition of "activation" is defined as the action or process of making something active or operative. (Dkt. No. 59 at 13.) Masabi contends that its proposed construction is required to properly define the role of the server system / computer system / computer in the "activation" process. Masabi contends that its construction properly defines the interaction between the server and the user's device that is the subject matter of this action. (*Id.*)

As to "causing activation," Masabi contends that the full phrases quoted above include "by transmitting to the user's computer device." Masabi contends that its construction is the only logical and reasonable interpretation of "causing an activation" as it properly defines the interaction between the server and the user's device that is the subject matter of this action. (Dkt. No. 59 at 16.)

As to "activation," Bytemark contends that Masabi's construction is at odds with the embodiment of '967 Patent 4:32-42 in which a payload is delivered with the ticket so that Internet availability is not needed at a later time. *See* '967 Patent at 4:32-42. Bytemark contends that it would accept a construction based on Masabi's dictionary definition: "the action or process of making something active or operative." (Dkt. No. 60 at 6.)

26

As to "causing activation," Bytemark contends that the second part of Masabi's construction ("that is immediately displayed without user interaction") modifies the first part of Masabi's construction. Bytemark contends that this modifier appears to be similar to that of dependent claims 7 and 28. (Dkt. No. 60 at 7.) Bytemark contends that the phrase improperly imports dependent claim limitations into independent claims. Bytemark contends that neither the first nor the second part of Masabi's construction relates to the term "causing an activation." (*Id.*)

At the oral hearing, neither party provided argument specific to this term.

**<u>Analysis</u>**

Masabi seeks to limit the "causing" to a specific transmission of a file and an immediate display without user interaction. Masabi has not identified any instances in the intrinsic record of lexicography, disavowal, or disclaimer mandating such limitations. *See GE Lighting Solutions*, 750 F.3d at 1309; *Cordis Corp.*, 561 F.3d at 1329. Further, the language following the "causing [cause] an activation" provides the required details on the causing: "by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, …." The primary dispute presented by the parties, though, still remains: whether the "server" / "computer system" / "computers" cause the activation. This dispute is more appropriately addressed by the next disputed claim term: "causing [cause] activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object." The issue presented by the "causing activation" is similar to the "receiving…" term discussed above and the same rationale applies. The Court addresses this dispute in the full phrase of the next disputed term: "causing [cause] an activation of the purchased electronic ticket by transmitting to the user's computer device a data

file comprising the visual validation display object." With the resolution of that dispute in the full phrase, "activation" and "causing [cause] an activation" need no further construction.

**The Court construes the terms "activation" and "causing [cause] an activation" to have their plain and ordinary meaning.**

8.  **"causing [cause] an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object"[8] ('967 Patent claims 1, 17, and 18)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning except as to the construction of the phrase "visual validation display object" as construed by Bytemark | "Transmitting a file to the user's device containing a visual validation display object that is immediately displayed without user interaction" |

The parties' primary dispute is the same as presented for "activation" and "causing [cause] an activation."

<u>Positions of the Parties</u>

Masabi notes that the term is found in the full phrases: "causing an activation of the purchased electronic ticket by transmitting to the user's computer device a data file the visual validation display object" / "cause an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object." '967 Patent claims 1, 17, 18. Masabi contends that the dictionary definition of "activation" is  the action or process of making something active or operative. (Dkt. No. 59 at 17.) Masabi contends that the claim language itself states the "activation… by transmitting to the user's computer device."

---

[8] The parties did not include "causing [cause] an" for construction. The Court construes the full phrase.

Masabi contends that its construction properly defines the interaction between the server and the user's device that is the subject matter of this action.

Bytemark contends that Masabi provides no evidence and only attorney argument to support its construction. (Dkt. No. 60 at 8.) Bytemark states that other than "visual validation display object," which is construed above, no further construction is needed. (*Id*.)

At the oral hearing, Bytemark agreed to the Court's construction adopted below. (Dkt. No. 80 at 44-45, 48.) At the oral hearing, Masabi provided no argument specific to this term.

<u>Analysis</u>

The concepts of the constituent terms "activation," "the purchased electronic ticket," and "visual validation display object" have been addressed above. As discussed above, the primary dispute between the parties relates to whether the full term requires the "server" / "computer system" / "computers" to cause the activation. The issue presented by the full term, "causing activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object," is similar to the "receiving …" term. Specifically, the dispute centers upon whether the term is limited to the "server" / "computer system" / "one or more computers" causing the activation. For the same reasons noted above for the "receiving…" term, the Court finds that the "server" (claim 1) / "computer system" (claim 17) / "one or more computers" (claim 18) cause the activation.

**The Court construes the term "causing [cause] an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object" to mean "the [server / computer system / one or more computers] causing [cause] the activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object."**

29

9. **"confirms that the user possesses the previously purchased electronic ticket"** **('967 Patent, claims 1 and 17)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary | "Validates that an electronic ticket stored on the user's device has been properly purchased in a previous discreet operation" |

The parties focus on the similar issue as to whether the ticket has to have been previously purchased.

**Positions of the Parties**

Masabi contends that in context of the full claim language, the "server system" / "computer" receives the request from the mobile device to confirm the user is in possession of the previously purchased ticket. Masabi notes that its construction includes Masabi's proposed definitions of "possesses" and "previously purchased electronic ticket" (Dkt. No. 59 at 15.) Bytemark provides no argument other than to contend the term is clear and no construction is required. (Dkt. No. 60 at 7.) At the oral hearing, Masabi provided no argument specific to this term.

**Analysis**

Masabi attempts to interject into this term the fundamental dispute regarding the distinctions in time between the purchase of the ticket and the validation process. That dispute is more properly addressed in other terms and the interrelation of other elements of the claim. Having construed terms "possesses" and "previously purchased electronic ticket" above, the Court finds that no further construction of the "confirms…" term is required.

**The Court finds that the term "confirms that the user possesses the previously purchased electronic ticket" has its plain and ordinary meaning and needs no further**

construction beyond the construction of the terms "user possesses" and "previously
purchased electronic ticket" which are construed separately above.


10. **"remote display device"  ('993 Patent, all asserted claims)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "a piece of electronic equipment located in a remote location from the ticketing server and containing an electronic display" |

The parties dispute what the display device is "remote" from.

**Positions of the Parties**

Masabi notes that the term "remote display" is not found in the specification of the '993
patent with the exception of the claims. Masabi notes that the specification and the parent '967
Patent both reference a "user's computer device." Masabi contends that such usage of different
terms indicates an intent for a variation in claim scope. (Dkt. No. 59 at 22.) Masabi contends that
Bytemark leaves it to mere speculation as to what this variation is. Masabi contends that its
construction provides guidance. (*Id.* at 23.) Bytemark contends that Masabi provides only attorney
argument and no evidence to support its construction. (Dkt. No. 60 at 9.) At the oral hearing,
Bytemark agreed to the Court's construction adopted below. (Dkt. No. 80 at 44-45, 48.) At the
oral hearing, Masabi provided no argument specific to this term.

**Analysis**

The specification uses the term "remote" with reference to two computers on the Internet
that are remote from each other or linked through a communication network. *See* '993 Patent
11:46-55, 13:18-23. As to a "remote display device," that term is not utilized in the specification
outside of the claims. However, in context of the claims and the specification as a whole, it is clear

31

that the activities described in the claims for the "remote device" are activities on the user's computing device. Further, the specification includes the discussion:

> The system operates on one or more computers, typically one or more file servers connected to the Internet and also on a customer's computing device. A customer's device can be a personal computer, mobile phone, mobile handheld device like a Blackberry™ or iPhone™ or any other kind of computing device a user can use to send and receive data messages. The customer's device is used to display the validating visual object.

'993 Patent 2:8-15. In addition, a customer device is shown as being separate from the system server and database. *Id.* 3:45-47, Figure 1.  The rest of the specification is replete with disclosure regarding the separate customer device and server / computer. Claim 1 also provides "a central computer system" and discusses matching a token transmitted to the "remote display device" with a copy stored on the "central computer system." Claim 8 recites "a central computer system" and then recites that the "remote display device operatively connected to the central computer system over a data communication network." Though the term "remote display" is not utilized in the specification, in context of the claims and specification, "remote" is clearly meant to be "remote" in relation to the "central computer system" of the claims.

**The Court construes the term "remote display device" to mean "a display device remote from the central computer system."**

11. **"validating [validates] the token"  ('993 Patent, claims 1 and 8)**

| Bytemark's Proposed Construction | Masabi's Proposed Construction |
|---|---|
| No construction necessary – plain and ordinary meaning | "comparing the unique character string associated with a purchased ticket generated during a discreet and prior operation (wherein the purchase is effectuated and a token is sent to the mobile device) with a unique character string stored on the server" |

The parties' dispute focuses upon the same basic issues as presented in the "receiving …" term above: whether ticket purchase and token validation are separate steps and whether the server performs this step.

**Positions of the Parties**

Masabi contends that its construction provides necessary context by including reference to the transactional separation between ticket purchase and token validation. Masabi contends that the claims recite a central computer system that sends a token to the mobile device and stores a copy in one transaction and then validates the token by comparing the mobile phone token to the copy stored on the central computer system. (Dkt. No. 59 at 23.) Masabi contends that it is contradictory for the claim language of the '993 patent to be construed as encompassing purchase and delivery of the validation display element in a single transaction.

Masabi contends that if the purchase and validation were performed in a single operation, there would be no purpose for a central computer system to match tokens it had just sent and stored a copy of. (*Id*. at 24.) Masabi contends that Bytemark seeks to construe the claim language to read on a single purchase/delivery of an electronic ticket. (*Id*.)

Bytemark cites to an online dictionary (apparently the present 2017 definition) to contend that the plain and ordinary meaning of "validating the token" is "establishes the legitimacy of the token." (Dkt. No. 60 at 9, n. 1.) Bytemark objects to Masabi's construction as limiting the manner in which validation must take place: "comparing the unique character string associated with a purchased ticket… with a unique character string stored on the server." Bytemark contends that this language is at odds with the literal claim language that follows the term "validating the token:" "validating the token by matching the token transmitted to the remote display device to the copy of the unique alphanumeric string stored on the central computing system." Bytemark contends

that Masabi's construction changes the meaning of the larger phrase. (*Id*. at 10.) Bytemark also objects to Masabi's construction for replacing the original language "on the central computing system" with "stored on the server."

Finally, Bytemark contends that Masabi's construction adds new limitations to the ticket purchase and transmission requirements that have nothing to do with the term "validating the token:" "…a purchased ticket generated during a discreet and prior operation (wherein the purchase is effectuated and a token is sent to the mobile device)…." (*Id*.)

**<u>Analysis</u>**

As to what "validating" means, the surrounding claim language describes the validating process: "validating the token by matching the token transmitted to the remote display device to the copy of the unique alphanumeric string stored on the central computing system." Masabi has provided no support for deviating from this explicit claim language.

The broader issue presented by the parties is the same as presented above with regard to the "receiving…" term: whether ticket purchase and token validation are separate steps and whether the server performs this step. For the same reasons as discussed above with regard to the "receiving…" limitation, the Court rejects Bytemark's contentions. Here, the claims are directed toward "validation of the possession of a ***previously purchased electronic ticket***" (claim 1) and "validating ***previously purchased electronic tickets***" (claim 8). Just as in the '967 Patent, the claims then recite numerous steps that would be discrete from the purchase operation which happens "previously."  Further, it is clear that the claims are directed to steps performed by the "central computer system," not operations solely performed within the remote display device. Claim 1 recites "transmitting a token…to a remote display device," a copy is "stored on a central computer system," "matching the token transmitted to the remote display device to the

copy…stored on the central computer system," and "transmitting to the remote display device a…object,"  Claim 8 recites "a central computer system" and "at least one remote display device operatively connected to the central computer system" and then "wherein the central computer system…transmits a token…and …validates the token…." Similar to the '967 Patent claims discussed above, it is clear that these claim elements are not elements that are done solely within a remote display device. Further, as discussed above with regard to the passage at '967 Patent 4:32-42, that passage is equally inapplicable to the claim elements of the '993 Patent as again, as with the '967 Patent, almost the entirety of the claim limitations are absent from the embodiment of 4:32-42 which does not describe the transmitting, token storage and validation steps.

**The Court construes the term "validating [validates] the token" to mean "the central computer system validating [validates] the token transmitted in a discrete prior purchase operation."**

### CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 20th day of June, 2017.**

35

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE