**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| BYTEMARK, INC. | § | |
| | § | |
| v. | § | Case No. 2:16-cv-00543-JRG-RSP |
| | § | |
| MASABI LTD. | § | |

**REPORT AND RECOMMENDATION**

On May 20, 2016, Bytemark filed a lawsuit against Masabi, alleging that Masabi infringes claims of U.S. Patent Nos. 8,494,967 and 9,239,993. *See* Compl., Dkt. 1. Bytemark is now asserting claims 1-5, 17-22, and 34 of the '967 patent, and claims 1-17, and 22-24 of the '993 patent. Dkt. 112-7 at 1. Masabi has moved for summary judgment of invalidity, contending that the asserted claims are invalid under 35 U.S.C. §§ 101, 102, 103, and 112. Dkt. 113. Plaintiff has filed a lengthy response. Dkt. 121. Because the claims recite subject matter that is not patent-eligible, the Court recommends that summary judgment of invalidity under § 101 be granted, that summary judgment of invalidity on the other grounds be denied as moot, and that the stay previously entered be lifted.

**BACKGROUND**

The '967 and '993 patents generally relate to computer systems and methods for verifying the authenticity of an electronic ticket. The patents trace back to two applications filed in March 2011. The patents are also related to a common parent application filed on May 18, 2012. The parent application claims priority to an application filed on March 11, 2011. The application leading to the '993 patent is a continuation of the application that became the '967 patent, and, consequently, both patents-in-suit share a nearly identical specification.

1

The problem described by the patents relates to authenticating a previously purchased electronic ticket displayed on a customer's phone or mobile device. *See* '967 patent at 1:24-43. According to the patents "[v]enues such as theaters, amusement parks and other facilities that use tickets, for example airlines, ferries and other transportation have a need to use electronic ticketing." *Id.* at 1:24-26. Electronic ticketing systems existed, but verifying the authenticity of the ticket was difficult. *Id.* at 1:28. An electronic ticket that included a barcode, for example, could be displayed on a customer's mobile phone, but the phone had to be placed on a scanner that reads the barcode. *Id.* at 1:30-32. The problem with this process, as the patents describe it, is that it "is fraught with error and the time taken to verify the electronic ticket far exceeds that of the old system: looking at the paper ticket and tearing it in half." *Id.* at 1:32-35. This is because barcode scanners were not designed to read an LCD screen displaying a barcode. *Id.* at 1:35-36. The patents describe a "need for an electronic ticketing system that provides a human-perceivable visual display that the venue can rely on to verify the ticket." *Id.* at 1:38-40.

The patents describe the invention as a "novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event." *Id.*, abstract. The verifying visual object "removes the need to use a bar-code scanner on an LCD display of a cell phone or other device and speeds up the rate at which human ticket takers can verify ticket holders." *Id.*

The '967 patent includes three independent claims, all of which recite similar methods and systems for implementing the ticket-authentication process. Claim 1 recites:

> A method by a server system for obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker comprising:

>receiving from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased electronic ticket for utilization of a service monitored by the ticket taker, the visual validation display object configured to be readily recognizable visually by the ticket taker;
>
>receiving from the user's computer device a token associated with the received request;
>
>determining whether a token associated with the purchased electronic ticket has been stored in a data record associated with the received request, and if it has, whether the received token is valid; and
>
>in dependence on the determination that the received token is valid, causing an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, the user to be permitted to utilize the service monitored by the ticket taker.

The asserted claims that depend from claim 1 (claims 2-5) recite additional steps, such as encrypting the visual validation object using an authorization key, as recited in claim 5, for example. Independent claim 17 recites a system capable of performing the method recited in claim 1, with the only meaningful difference being that claim 17's preamble specifies that the system is "[a] non-transitory computer readable data storage medium containing computer code" capable of executing instructions. Claim 17 has no dependent claims. Independent claim 18 recites a nearly identical system to that recited in claim 17, "configured to perform" the method of ticket authentication, and the asserted claims that depend from claim 18 recite limitations similar to those in the other dependent claims.

The only notable difference in the '993 patent claims is that the '993 patent claims are in one respect narrower than the claims of the '967 patent. Namely, the '993 patent claims recite that the "token" is "a unique alphanumeric string." This limitation appears in both independent claims

(claims 1 and 8). The claims are otherwise not meaningfully different than the '967 patent claims.

Claim 1 of the '993 patent, for example, recites:

> A method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising:
>
> transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique alphanumeric string, and wherein a copy of the unique alphanumeric string is stored on a central computer system;
>
> validating the token by matching the token transmitted to the remote display device to the copy of the unique alphanumeric string stored on the central computing system to provide a ticket payload to the remote display device;
>
> securing a validation display object prior to transmission to provide a secured validation display object;
>
> transmitting to the remote display device a secured validation display object associated; with the ticket payload; and
>
> enabling the remote display device to display the secured validation display object upon validation of the token for visual recognition by the ticket taker or preventing the remote display device from displaying the secured validation display object in the event that the token is not validated.

The claims that depend from claims 1 and 8 of the '993 patent, like the dependent claims of the '967 patent, recite additional steps, but the essence of the invention is captured by the independent claims.

## I. The Claims' Software, Data, and Hardware Elements

The asserted claims recite, with varying terminology, two hardware elements: a computer or server system and a customer's device. The specification refers to the computer system or server primarily in terms of its function. As shown in Figure 1 of the '967 patent, for example, the website where the customer purchases an electronic ticket accesses a server system, which is coupled to a

database that includes information related to the venue, the customer's username and password, and other information. '967 patent at Fig. 1, 3:41-60.



When the user selects a ticket, the user can also select a visual validating object. *Id.* at 3:41-60. The server then transmits the selected object to the customer's device. *See, e.g.*, *id.* at 2:42-44. The server also generates and sends the token to the customer's device. *Id.* at 5:48-50.

The server is otherwise described as a website or file server connected to the internet and a database. *See, e.g.*, *id.* at 10:52-11:28, 2:4-5. The central server, for example, can be "a computer comprised of a central processing unit with a mass storage device and a network connection." *Id.* at 11:29-56. Notably, "[t]he precise architecture of the central server does not limit the claimed invention." *Id.* at 11:4-6.

5

Similarly, the "computer device" or "remote display device" recited in the claims is described in broad, generic terms. The precise definition of these terms is difficult to determine because the terminology used even within the same patent is often inconsistent. The specification of '967 patent, for example, equates "servers" with "one or more computers," and the term "computer device" is not clearly defined. *See id.* at 2:4-6. The specification does state, however, that "[a] customer's device can be a personal computer, mobile phone, mobile handheld device like a Blackberry or iPhone or any other kind of computing device a user can use to send and receive data messages." *Id.* at 2:6-9. Such devices, as the specification acknowledges, are "well known computing systems." *Id.* at 12:21-30. The purpose of the computer device is to receive the visual validating object and token and display the validating object on the screen of the device so that a ticket taker can verify the authenticity of the ticket. *See id.* at 2:10-11.

In addition to the hardware elements, the asserted claims generally include three software or data elements: the "validation display object," the "token," and the "electronic ticket." The "visual validation display object" is a unique image. "The criterion for what constitutes a validating visual object is one that is readily recognizable from human observation" and which is "encapsulated in such a way as to be transmitted to the customer's device with a minimum of network latency or download time, and that can be reasonably secured so as to avoid piracy." '967 patent at 3:12:23. The parties disputed the meaning of "visual validation display object" and "validation display object" during claim construction, and the Court resolved the dispute by construing these terms to mean "any object that is readily recognizable from human observation that can verify a ticket, or the code or commands that can generate such an object." Dkt. 81 at 11. An example of a visual validation display object is a sailboat, as shown in Figure 5 of the '967 patent:



The other two software or data elements are also stored on the server and ultimately transmitted to the customer's device. The "token" recited in the claims is "a unique number." '967 patent at 2:45-48. The token can be generated, for example, by the website where a customer purchases a ticket. *Id.* The website then sends the token to the user's device. *Id.* The claims of the '993 patent further specify that the token "is a unique alphanumeric string." *See, e.g.*, '993 patent, claim 1. The term "electronic ticket" is not defined by the patent, implying that the claimed electronic ticket is the same as those that existed in the prior art discussed in the specification. *See, e.g.*, '967 patent at 1:27-46.

## II.   Prosecution of the Patents-in-Suit and Related Applications

The prosecution history of the application that ultimately became the '967 patent contains one noteworthy rejection. Claims 1-16, as originally filed, recited methods similar to those that ultimately appeared in the issued claims. Original claims 17 and 18 were directed to systems for performing the method recited in claim 1. Claim 17 recited "[a] system comprised of a website adapted to perform any of the methods of Claims 1-16," while claim 18 recited "[a] computer

readable medium containing computer program code that when run causes the performance of any of the methods of Claims 1-16." In an office action dated September 28, 2012, the examiner rejected these claims under § 101 because the claims were "directed to non-statutory subject matter." Office Action, Appl. No. 13/475,881, at 3 (Sept. 28, 2012). Both claims, according to the examiner, were directed only to software or transitory signals, both of which constituted ineligible subject matter under existing Patent Office guidelines. The applicant overcame this rejection by amending the claims to recite hardware components and a "non-transitory" computer-readable medium. *See* Resp., Appl. No. 13/475,881 (Mar. 27, 2013). The examiner allowed the claims on April 10, 2013, more than a year before the Supreme Court decided *Alice Corp. Pty v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).

The application leading to the '993 patent did not escape the § 101 challenge as easily. The first rejection of the '993 application came about six months after *Alice*. Although the examiner did not cite *Alice*, the *Alice* test was the basis for one of the rejections. The examiner regarded all the pending claims as being directed to the abstract idea "of organizing human activity such as purchasing a ticket and then showing a ticket to access either goods or services." Office Action, Appl. No. 13/901,243, at 3 (Oct. 29, 2014). The additional claim elements, according to the examiner, were "mere instructions to implement the idea on a computer" or "well-understood, routine, and conventional activities previously known to the pertinent industry." *See id.*

The applicant's first attempt at responding to this rejection was not successful. The applicant argued that the "validation display object" has certain properties and is "readily recognizable visually," and that this feature renders the claims patent-eligible. *See* Office Action, Appl. No. 13/901,243, at 2 (May 27, 2015). This argument was not persuasive because, according to the examiner, the validation display object is no different than a physical ticket that is verified

visually by a ticket taker. *See id.* at 2-3. The applicant also argued that the invention "solves technological problems with computer technology (LCD screens, scanners)" inasmuch as the invention avoids the need for a barcode. *See id.* at 3-4. The examiner found this argument unpersuasive because while the specification discussed "the flaw in the present technology," the specification did not reveal an "inventive step," or an improvement to the technology itself. *See id.* at 4.

After the applicant filed a request for continued examination and paid the requisite fee, the examiner allowed the claims. In the notice of allowance, the examiner stated that "[t]he matter of judicial exception was discussed between the Examiner and a 101 expert, Jim Trammell." Notice of Allowance, Appl. No. 13/901,243, at 2 (Sept. 9, 2015). During this discussion, the examiner and Mr. Trammell concluded that the claims represent a technological advance by "adding greater security to an electronic ticket." *See id.* The claims issued on December 29, 2015.

Although the claims of the patents-in-suit eventually overcame scrutiny under then-existing interpretations of § 101 and *Alice*, a number of related applications remained in prosecution, and these applications have not fared as well. These applications have specifications that are similar to those of the patents-in-suit, and many of these claims are remarkably similar to those recited in the asserted patents. In April of 2017, the claims in one of these applications were rejected under § 101 as being "directed to abstract idea of determining fraudulent activity associated with a ticketing system." *See* Office Action, Appl. No. 14/286,622, at 3 (Apr. 13, 2017). This idea, according to the examiner, was similar to the idea found abstract and patent-ineligible in *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089 (Fed. Cir. 2016). *See id.* The additional elements recited in the those claims, including a "server computer sub-system," a "device," and a "network" were not significant enough, in the examiner's view, to take the claims

9

away from the abstract idea. *See id.* Another examiner lodged the same rejection in a similar application, finding that the claims were directed to the abstract idea of "electronic ticket verification." *See* Office Action, Appl. No. 14/597,905, at 3 (Oct. 6, 2017). According to this examiner, the claims were similar to claims directed to data recognition and storage, such as those found ineligible in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014). *See* Office Action, Appl. No. 14/823,157, at 4 (Oct. 6, 2017).

For much of the same reasons as the examiners have articulated in these related patent applications, Masabi argues that the asserted claims of the patents-in-suit cannot withstand scrutiny under current § 101 jurisprudence. Accordingly, Masabi moves for summary judgment that the asserted claims are invalid for failure to recite patent-eligible subject matter.

## DISCUSSION

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The exception is that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1293 (2012)). In assessing subject-matter eligibility, a court must "first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S.Ct. at 2355. If the claims are directed to an ineligible concept, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1298, 1297).

I.      **The Asserted Claims Are Directed to an Abstract Idea**

When evaluating claims related to computer technology, a court must "articulate with specificity what the claims are directed to, and 'ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)) (citing *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017)). At least four considerations help guide the step one inquiry: the claim language, the specification, the prosecuting history, and past cases. *See, e.g.*, *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir.), *cert. denied*, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015). In addition, while patent eligibility under § 101 is an issue of law, the ultimate legal conclusion may require an underlying factual determination. *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013). The Court finds no relevant disputed underlying facts in this case, nor has Plaintiff demonstrated any.

The claim language often reveals whether an invention is directed to an improvement to computer technology, on the one hand, or merely the implementation of an abstract idea using computers, on the other. *Enfish*, 822 F.3d at 1336, 1339; *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016). Computer-related claims withstanding scrutiny by the Federal Circuit under step one have generally recited a technological improvement in the claims themselves. *See Visual Memory*, 867 F.3d at 1259 (enhanced computer memory system); *Thales*, 850 F.3d at 1345 (motion-tracking system); *Enfish*, 822 F.3d at 1339 (self-referential table). In close cases, it may be difficult to determine what the claims are directed to under step one, and in such cases, the claim language may reveal concrete improvements to

11

computer technology under the step two analysis. *See Enfish*, 822 F.3d 1327 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014).

This is not a close case under step one. The preambles of the asserted claims all refer to a method of authenticating a ticket by showing a ticket taker a validation display object. The claims recite the use of computers, servers, and devices, but these components are referenced in terms of their conventional functions, such as sending, receiving, storing, and verifying data or information. It is well established that "claims directed to the collection, storage, and recognition of data are directed to an abstract idea." *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, No. 2016-1233, 2017 WL 4654964, at *6 (Fed. Cir. Oct. 18, 2017). The features of the claims may enable a ticket taker to verify the authenticity of a ticket quickly and efficiently, but this is not an improvement to the technology itself. Federal Circuit precedent "is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015).

Similarly, the software or data elements recited in the claims are not technological improvements. Nor is the combination of those elements. The "validation display object" is simply an image, such as a sailboat, created by and stored on a computer. The "token" is a number, and the use of tokens, or "tokenization" was well-known long before the priority dates of the asserted claims. *See* Dkt. 113 at 15. Indeed, as the Federal Circuit recently found, the use of "tokens" in a computer environment is not a technological improvement, but rather "much like the identification of a coin or token as genuine in a mechanical transit system toll device." *Smart Sys. Innovations*, 2017 WL 4654964, at *8. " The "electronic ticket" is likewise not a technological improvement because the claims themselves contain no indication that the ticket is anything other than the type

of well-known electronic ticket described in the specification—without any reference to the technical details of the ticket. The absence of technical details indicating that a hardware or software component recited in the claims is a technological improvement supports a finding that the claims are abstract. *See id.* In sum, the patent-ineligible abstract idea "is plainly identifiable and divisible from the generic computer limitations recited by" the claims. *DDR Holdings*, 773 F.3d at 1256. Finally, although claim 1 of both patents is sufficiently representative, *see Content Extraction*, 776 F.3d at 1348, the dependent claim limitations do not alter the analysis.

The specification and prosecution history of a patent can also be useful in determining whether the claims are directed to an abstract idea. The specification will often emphasize the feature of the claims that distinguishes them from the prior art. In *Enfish*, for example, the specification disparaged conventional data structures and described the "present invention" as the self-referential table recited in the claims, which supported the Federal Circuit's conclusion that the claims were patent-eligible. *See* 822 F.3d at 1339. By contrast, the specification and prosecution history in *OIP Technologies* emphasized that the "key distinguishing feature of the claims is the ability to automate or otherwise make more efficient traditional price-optimization methods." *See* 788 F.3d at 1363.

The step one inquiry in this case could likely end with the claim language, but the specification and prosecution history support the conclusion that is evident from the claims. The background of the patents discusses the existing problem with electronic ticketing and the "need for an electronic ticketing system that provides a human-perceivable visual display that the venue can rely on to verify the ticket." '967 patent at 1:38-40. The patents describe the invention as a "novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object

that is selected by the venue for the specific event." *See, e.g.*, *id.*, abstract. The verifying visual object "removes the need to use a bar-code scanner on an LCD display of a cell phone or other device and speeds up the rate at which human ticket takers can verify ticket holders," *id.*, but there is no indication that the image itself or the method of creating it is a technological improvement, *cf. McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (patent focused on "specific asserted improvement in computer animation").

The prosecution history points to the same conclusion. First, the use of a validation display object was repeatedly emphasized as an important aspect of the invention. In distinguishing a prior art reference during the prosecution of the '967 patent, for example, the applicant emphasized that the validation display object is "readily recognizable by a ticket taker, as in the form of an image, an animation or other dynamic object that permits the ticket taker to effortlessly and quickly recognize that the device is displaying an object that the ticket taker expects to see at that time." Resp., Appl. No. 13/475,881, at 9 (Mar. 27, 2013).

Second, claims 17 and 18, as originally-filed, recited "[a] system comprised of a website adapted to perform any of the methods of Claims 1-16," and "[a] computer readable medium containing computer program code that when run causes the performance of any of the methods of Claims 1-16," respectively. While the inquiry must focus on the issued claims, the method recited in the original claims is not meaningfully different than the method recited in the claims that issued. By essentially reciting nothing more than "perform the method on a computer," original claims 17 and 18 suggest that the focus of the invention is an abstract idea for which "for which computers are invoked merely as a tool." *See Enfish*, 822 F.3d at 1336.

Third, the examiner rejected the '993 patent claims under *Alice* well before its contours had been defined by the Federal Circuit. Bytemark emphasizes that the applicant overcame this

14

rejection, and that the examiner even made the rare decision to consult a "101 expert" before allowing the claims. But the Supreme Court had issued the *Alice* decision only six months before the claims were allowed, and the reach of *Alice* was not yet understood. Notably, in the continuation applications that remain pending today, claims that arguably include greater technical detail than the asserted claims have been rejected by the Patent Office under more recent § 101 precedent.

In addition to the claims, specification, and prosecution history, it is often "sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *See Enfish*, 822 F.3d at 1335. Claims that are similar to the claims at issue here were found to be directed to an abstract idea in *Smart Systems Innovations*. *See* 2017 WL 4654964. The claims involved "acquiring identification data from a bankcard, using the data to verify the validity of the bankcard, and denying access to a transit system if the bankcard is invalid." *Id.* at *6. The point of the invention was to allow "riders to conveniently and quickly access mass transit by using existing bankcards." *Id.* at *2. But the claims did not improve an existing technological process and were not, for example, directed to "a new type of bankcard, turnstile, or database." *Id.* at *6. The Federal Circuit rejected the appellant's argument that the claims are patent-eligible "because they improve prior systems of fare collection by speeding up the process at the turnstile." *Id.* A district court invalidated similar claims directed to verifying and authenticating certain information, and minimizing tampering, during an online bingo game. *See Planet Bingo, LLC v. VKGS, LLC*, 961 F.Supp.2d 840 (W.D. Mich. 2013).

More generally, the claims are a hybrid of two categories of claims routinely invalidated under § 101. On one hand, the asserted claims involve collecting, storing, recognizing, and manipulating data, or encoding or decoding data, to make the data human- or machine-readable.

This feature of the claims has been repeatedly characterized as being directed to an abstract idea. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340-41 (Fed. Cir. 2017). On the other hand, the method recited in the asserted claims ensures the security of a financial transaction, and may improve the ticket-taking process. Claims directed to business practices or financial transactions are also routinely invalidated under § 101. *See id.* at 1340. Finally, the claims do not resemble claims directed to improved computer technology that have survived scrutiny under *Alice* step one. *See Visual Memory*, 867 F.3d at 1259 (enhanced computer memory system); *Thales*, 850 F.3d at 1345 (motion-tracking system); *Enfish*, 822 F.3d at 1339 (self-referential table). In sum, the claims are directed to the abstract idea of verifying the authenticity of a ticket.

## II. The Claims Lack an Inventive Concept

It becomes apparent, in light of the step one analysis, that the asserted claims do not include an inventive concept sufficient to move the claims away from the abstract idea. A claim contains an inventive concept if it "include[s] additional features" that are more than "well-understood, routine, conventional activities." *Alice*, 134 S.Ct. at 2357. Each hardware or software feature of the asserted claims is conventional, as is the manner in which those features operate and interact. The hardware features—a computer or server system and a mobile device—were both well known, and this is evident from the specification. The server is described in broad, almost unlimited terms, and, indeed, "does not limit the claimed invention." *See, e.g.*, '967 patent at 11:4-6. The mobile devices, as the specification acknowledges, were "well known computing systems." *Id.* at 12:21-30. The same is true of the software and data components—the "validation display object," the "token," and the "electronic ticket." There is no indication that any of these elements, or their combination, is the product of an inventive concept. Rather, the claims, specification, and

16

prosecution history all suggest that the concept recited in the claims is nothing more than using these conventional tools to verify the authenticity of an electronic ticket. *See, e.g.*, '967 patent, abstract; Resp., Appl. No. 13/475,881, at 9 (Mar. 27, 2013). When claims like the asserted claims are directed to an abstract idea, generic computer implementation does not move the claims "into section 101 eligibility territory." *See buySAFE Inc. v. Google, Inc.*, 765 F.3d 1350, 1354 (Fed. Cir. 2014).

The fact that the claims may be confined to a particular application, or that they may even be narrow, is not sufficient to change the analysis. Limiting an abstract idea "to a particular . . . environment does not render the claims any less abstract." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016). A claim that is limited to a particular environment, or a narrow claim, may not preempt application of the abstract idea, but "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 2511, 195 L. Ed. 2d 841 (2016). In other words, ineligibility may be most evident where a claim wholly preempts application of an idea, but the inverse is not necessarily true. A claim that does not preempt application of an idea may be ineligible simply because it recites ineligible subject matter as defined by *Alice* and its progeny, rendering the preemption inquiry moot. *Id.* Such is the case here.

## CONCLUSION

The claims of the '967 and '993 patents may have improved the way ticket takers verify the authenticity of an electronic ticket. The claimed invention may have reduced long-lines and the prevalence of counterfeit tickets. And, as the prosecution history of the patents reveals, the claims at one time may have passed the § 101 filter. But under the law as it stands today, the

asserted claims are not patent-eligible. Accordingly, the Court recommends that Masabi's motion for summary judgment of invalidity under § 101 be granted, that the motion for summary judgment of invalidity on other grounds be denied as moot, and the stay previously entered be lifted.[1]

**SIGNED this 25th day of November, 2018.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

---

[1] A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).